[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiffs claim title to certain property by adverse possession as depicted on Schedule C attached to the original complaint. The record owners of the property in dispute are the defendants, and their property abuts the property owned by the plaintiffs. The plaintiffs acquired their home and property on September 19, 1985, which is designated as lot 8 on map number 26094, recorded on the Westport land records on December 16, 1965 (plaintiff's exhibit B), and their lot comprises 2.432 acres. The defendants acquired their property, comprising 2.041 acres, as shown as lot number 7 on the same map, on April 12, 1994.
The plaintiffs' predecessors in title were James and Emilia Ann Leavy who acquired their title some time prior to September 19, 1985. No deed into the Leavy's was produced. The defendants' predecessors were G. F. Property Corp., Helen Sprintz-Faber, acquired the property from Alice C. Guyott on April 3, 1981, and Frederick and Arlene C. Guyott, Jr., who acquired the property on July 7, 1967.
The property line in question is the southwesterly boundary of lot number 7, measuring 234.89 feet and shown as the line between points "X" and "O" on exhibit B. It is undisputed that the true property line separating lots 7 and 8 is as shown on that exhibit. The property in dispute is the triangular piece of property located north of this line as shown on Schedule C attached to the complaint.
In order to prevail, the plaintiffs must prove by clear and convincing evidence that they or their predecessors openly, notoriously, exclusively and uninterruptedly possessed the property claimed for longer than fifteen years without consent of the record owner. Woycik v. Woycik, 13 Conn. App. 518 (1988). The use is not exclusive if the adverse user merely shared dominion over the property with other users.
The plaintiffs in this case admitted that they did not have a survey prepared when they acquired their property in 1985, but CT Page 8223 assumed that the property line between parcels 7 and 8 was a line of trees, brush and heavy vegetation and portions of a broken down stone wall that existed on the property when they acquired it. That demarcation line is best shown on plaintiff's exhibits G, H and I. The stockade fence shown on exhibits G H mark the true boundary line and the fence was installed by the defendants on or about June 1, 1996.
When the plaintiffs acquired their property in 1985, it appeared as is shown on plaintiff's exhibit C with the lawn abutting a mulch area and then the tree line. The present view of that property is as shown on plaintiff's exhibit D with the stockade fence straddling the actual property line. During the plaintiffs' entire occupation, they used the property right up to the tree line and stone wall remnants and there is no evidence of any other user. The plaintiffs mowed the lawn in that area, installed an underground watering system for their front yard, a portion of which went into the disputed area, and did some tree trimming and maintenance of the trees along the tree line. The heavy vegetation along the tree line acted as a natural buffer between the two properties.
The defendants also did not have a survey prepared when they purchased their property in 1994. John Geisler testified that he did not know exactly where his rear property line was located, but based on his review of the record map, he knew the line was not straight, but diagonal, and that it went beyond the tree line. He did nothing about it originally.
In the fall of 1995, the defendants had their property surveyed for other purposes and it disclosed the true boundary line. Some stakes were placed along the line, which prompted discussions with the plaintiffs. They considered some kind of property exchange to accommodate their various needs, but nothing was resolved. Finally, on or about June 1, 1996, the defendants installed the stockade fence along the property line. In order to interrupt an adverse possession, the record owner must assert his claim to the land and perform some act that would reinstate him in possession before he can regain what he has lost. It requires actual entry or action by the owner. Woycik v. Woycik, supra. The fence installation was the act that reinstated the defendants' claim.
Therefore, the court finds that the plaintiffs from their title date of September 19, 1985, through June 1, 1996, did CT Page 8224 occupy the disputed area openly, notoriously, exclusively and uninterruptedly without the consent of the record owners for a period of ten years and 256 days.
In order for the plaintiffs to prevail, however, they must prove by the same higher standard of proof an additional adverse use by their predecessor in title of at least four years and 110 days. As stated previously, the plaintiffs' predecessors in title did not testify. No deed as to them was offered into evidence, but it can be assume that they acquired their title some time in the 1970's. That is based on the testimony of Donald Switter, a landscaper, who testified that he personally, or employees of his, mowed the Leavy's grass and did other trimming and pruning in the disputed area for eight to ten years before the plaintiffs' occupancy. He identified several of the plaintiffs' photo exhibits and testified that the property looked the same when he was performing his work. His was the only testimony in the case from anyone as to the status and appearance of the property in the eight to ten years period before the plaintiffs purchased the property.
There is, therefore, little if any direct testimony that the occupancy of the Leavy's was in fact open, hostile, notorious, exclusive, uninterrupted and without the consent of the record owner of the adjoining property during that time frame.
Proof of adverse possession, however, does not require that the proof establishing the claim be based entirely on direct evidence as opposed to circumstantial evidence and the logical and reasonable inference to be drawn therefrom. Woycik v. Woycik, supra. During the period from April 3, 1981 until September 19, 1985, the predecessor in title to the plaintiffs were the Leavy's and the predecessor in title to the defendants was Helen Sprintz-Faber. That period of time, from April 3, 1981 through June 1, 1996, when the stockade fence was installed, is in excess of fifteen years. No evidence or testimony was provided by either Leavy or Faber.
The only testimony offered concerning that period of time came from Mr. Switter, the landscaper, who testified that either he or someone in his employ mowed the Leavy's grass and that the area he mowed was essentially the same as that which, subsequent to September, 1985, was mowed by the plaintiffs. He further testified that he did other landscaping and tree pruning in the area of the stone wall. He offered no testimony as to the ownership of the disputed area. CT Page 8225
Although the Doctrine of Tacking allows an adverse claimant to add on or tack his period of possession to that of a prior adverse possessor in order to establish a continuous possession for the statutory period required, his burden of proving such prior possession must still be by the higher burden of proof of clear, positive and convincing evidence. With no direct evidence from the predecessor in title, the plaintiffs have failed to establish by that standard that during the tacked period of time the Leavys' possession was open, notorious, exclusive, uninterrupted and without the consent of the record owner, presumably Mrs. Faber.
Therefore, judgment will enter in favor of the defendants on the first count. For the reasons previously stated judgment will also enter for the defendants as to counts 2 and 3.
The fourth count of the complaint presents a different issue. That count claims that the erection of the stockade fence was done maliciously and with an intent to annoy the plaintiffs pursuant to Connecticut General Statutes § 52-480. There certainly was no evidence presented by the defendants that this type of fence was either useful, necessary or used for any construction purpose. If keeping out deer was the reason for installing the smaller wire fence along the stone wall, that purpose could easily have been satisfied by the installation of a less obvious and less obtrusive fence.
Just before the fence installation, the parties were trying to work out a resolution of the property line dispute by a property swap. The defendant Geisler testified that as soon as the plaintiff used the words adverse possession, the fence went up. There was no discussion at all between the parties as to the kind of fence. When viewing the plaintiffs' photo exhibits, it is obvious that no more destructive type of fence could have been installed to adversely effect the plaintiffs' property values. It is solid, over six feet tall and runs 234 feet through what both parties mistakenly believed was the middle of the plaintiffs' front yard.
The history of section 52-480 is fully discussed in the case of Whitlock v. Uhle, 75 Conn. 417, 426-427 (1903). The court in that case stated:
 Plainly, the real evil consists in the occasional CT Page 8226 subjection of a landowner to the impairment of the value of his land by the erection of a structure which substantially serves, and is intended to serve, no purpose but to injure him in the enjoyment of his land; and so a new exception is made to the absolute power of disposition involved in the ownership of land, as well as to the absolute submission involved in that ownership to the chances of damage incident to the use by each owner of his own land.
 We think it follows from the purpose of the Act, and from the conditions which define and limit this exception or new right and duty incident to the ownership of land, that the intent to injure by the erection of the structure is an intention which must be discovered mainly from the fact that the structure does impair the value of adjacent land and injure the owner in its use, from the absence of the reasonable possibility of any real advantage, whether of profit, protection, or pleasure, in the use of the land, and from the character, location and surroundings of the structure itself. It is quite possible for a structure to bear on its face, as it were, convincing evidence that it was intended for a legitimate purpose, or that it was intended to injure the adjacent land and its owner. Such intention relates to the thing done, its purpose and effect, and does not depend on the existence or non-existence of personal spite or ill-will. The intention is not the motive from which it may have sprung, but the established purpose, from whatever motive, to use the land in a manner not justified by its ownership, and forbidden by law. When a structure, useless to the owner, injuring adjacent land and its owner, intended to work such injury, is wilfully erected, it is maliciously erected; that is, it is erected in knowing disregard of the law and the rights of others.
In this case, it is clear that an extreme level of hostility had developed prior to the erection of the fence. That degree of hostility on the part of the defendant, John Geisler, was evident throughout the case, and he was admonished several times by the court for his actions.
The court finds that this type of fence clearly impairs the CT Page 8227 value of the plaintiffs' property, serves and was erected to serve no useful purpose in the use and enjoyment of the defendants' property and is of a description and location and in a surrounding indicative of a controlling purpose to injure the plaintiffs, and it does in fact injure the plaintiffs. When a structure, useless to the owner, injuring adjacent owners with intent to injure, is erected, it is maliciously erected; that is, it is erected in knowing disregard of the law and the rights of others.
Judgment for the plaintiffs is ordered as to the fourth count pursuant to § 52-480, and the defendants are ordered to remove the stockade fence in its entirety. The court will refrain from prohibiting the defendants from erecting another fence within their boundary, but forewarns the defendants that any new fence must have a lawful purpose and not injure the plaintiffs. The best way to insure that result is to consult with the plaintiffs about the nature of a new fence, if any is necessary, and for the plaintiffs to be reasonable in considering the matter.
GORMLEY, J.